UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACIE HAWKE-DINGMAN,

                    Plaintiff,                        Civil Action No. 11-cv-15493

        v.                               District Judge George Caram Steeh
                                             Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]**

Plaintiff Tracie Hawke-Dingman, proceeding *pro se*, appeals the Defendant Commissioner of Social Security's denial of her application for Disability Insurance Benefits under the Social Security Act. Before the Court for a Report and Recommendation are the parties' summary judgment motions. (ECF Nos. 3, 10, 13).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that Plaintiff has shown good cause for producing new evidence which is material to the disability determination. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence six of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED to consider the newly produced evidence. Jurisdiction should be retained.

## II.  REPORT

### A.  Procedural History

On March 10, 2010, Ms. Hawke-Dingman filed an application for Disability Insurance Benefits ("DIB") asserting that she became unable to work on December 10, 2009.  (ECF No. 8, Transcript ("Tr.") 9.)  The Commissioner of Social Security ("Commissioner") initially denied Plaintiff's disability application on May 7, 2010.  (*Id.*)  Plaintiff then filed a request for a hearing, and on April 18, 2011, she appeared with counsel before Administrative Law Judge ("ALJ") Patricia S. McKay, who considered the case *de novo*.  (*See* Tr. 9-16, 32-72.)  In a May 10, 2011 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 9-16.)  The ALJ's decision became the final decision of the Commissioner on October 19, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff, without the aid of counsel, filed this suit on December 15, 2011.  (ECF No. 1, Compl.)

### B.  Background

Ms. Hawke-Dingman, 44 years old on the alleged disability onset date, lives with her husband and three sons (two adults and one 17 year-old).  (Tr. 38.)  Plaintiff was trained as an EMT and worked as a medical assistant specialist at a hospital for five years.  (Tr. 39-30.)  At one time, she taught water aerobics and coached swimming.  (Tr. 40.)  She most recently worked as a caregiver for the elderly.  (Tr. 40.)

#### 1.  Medical Evidence Before the ALJ

On or around November 16, 2009, Plaintiff went to the emergency room for abdominal pain that had been ongoing for two weeks.  (Tr. 193.)  She reported occasional vomiting and diarrhea.  (*Id.*)  Dr. Keith Hinshaw, a surgeon, noted that about five years earlier, he had performed an

extensive "lysis of adhesions," a surgery involving cutting or removing internal scar tissue, and that Plaintiff had experienced intermittent abdominal pain since that surgery. (*Id.*; Tr. 324.) Dr. Hinshaw stated, however, that the cause of Plaintiff's vomiting and nausea were unclear. (Tr. 197.) Plaintiff was admitted to the hospital for pain control and intravenous hydration. (*Id.*) A stomach biopsy revealed "chemical (reactive) gastropathy [i.e., chemical injury to the gastric mucosa] such as [that] caused bile reflux, . . . anti-inflammatory medications, or excessive alcohol consumption." (Tr. 189.)

On December 10, 2009, Dr. Hinshaw performed another extensive lysis of adhesions in hopes of resolving Plaintiff's abdominal pain, nausea, and vomiting. (Tr. 205-06.) Plaintiff remained in the hospital for about a week post-surgery, and, by discharge, "she was tolerating diet and having bowel movements." (Tr. 205.)

Ten days later, however, Plaintiff returned to the emergency room with reports of "vomiting, diet intolerance, dark, strong urine [and nausea]." (Tr. 210; *see also* Tr. 210-61.) Plaintiff was admitted to the hospital the next day, December 21, 2009. After a week of in-hospital observation, on December 28, 2009, Plaintiff underwent yet another lysis of adhesions. (Tr. 213.) Because Plaintiff's adhesions were "extremely dense and difficult to release" Dr. Hinshaw removed about 75% of Plaintiff's small bowel. (*Id.*; Tr. 337.) At discharge, Plaintiff's bowels were functioning and her pain had, in Dr. Hinshaw's words, "settled down." (Tr. 213.) Plaintiff was discharged on January 8, 2010. (*Id.*; *see also* Tr. 210-61.)

On January 12, 2010, Plaintiff was admitted to the hospital because she was bleeding from her surgical incision. (Tr. 262-69.) The emergency-room report notes that the incisional bleeding was likely due to Plaintiff's Von Willebrand's disease. (Tr. 262, 269.) Von Willebrand's disease

3

is an hereditary bleeding disorder that adversely affects clotting. *See* A.D.A.M. Medical Encyclopedia, *Von Willebrand Disease*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001571/ (last visited Aug. 6, 2012).

About three weeks after her surgery, on February 1, 2010, Plaintiff was again admitted to the hospital for pain and diarrhea. (Tr. 282-302.) Plaintiff stated that her pain went around her back and had been constant for several days. (*Id.*) She was diagnosed with intractable diarrhea, dehydration, and abdominal pain. (Tr. 282.) An imaging study revealed a "hyperdense" mass in Plaintiff's pelvic cavity, a mild partial small bowel obstruction, and a low density mass consistent with a cyst on the right kidney. (Tr. 286.) After six days in the hospital, Plaintiff's bowels were still loose but no longer watery. (Tr. 282.) On February 7, 2010, Plaintiff was discharged in stable condition. (*Id.*)

On February 16, 2010, Plaintiff returned to the emergency room for abdominal pain and vomiting and was, yet again, admitted to the hospital — this time for nine days. (Tr. 303, 308.) Plaintiff reported pain at the nine-out-of-ten level. (Tr. 315.) Plaintiff had attempted to take Vicodin but was vomiting the medication, and, therefore, she could not medicate her pain. (Tr. 308.) The hospital physicians gave Plaintiff pain medication intravenously. (Tr. 317.) At discharge, a physician noted that Plaintiff had "done well with the present pain management." (Tr. 303.) Plaintiff reported pain from zero- to three-out-of-ten at rest and zero- to four-out-of-ten with activity. (Tr. 303.) Plaintiff had lost ten pounds over the previous two months. (Tr. 337.)

It appears that Plaintiff began treating at the Pain Clinic of Michigan ("Pain Clinic") in March 2010. (Tr. 326-36, 342-90.) On March 3, 2010, Plaintiff reported that she had been experiencing moderate to severe pain for the previous two weeks. (Tr. 387.) She also indicated,

however, that Hydromorphone gave her near-complete pain relief (nine-out-of-ten relief) and that Vicodin relieved her pain at the seven-out-of-ten level.  (Tr. 387.)  Dr. Rakesh Vakhariya noted, however, "miserable, unbearable pain."  (Tr. 333.)  He advised Plaintiff to continue her current medications but to taper the narcotic medications if her pain control was adequate.  (Tr. 378.)

On March 12, 2010 — about ten weeks after Plaintiff's December 2009 adhesion surgery — Plaintiff had a follow-up exam with Dr. Hinshaw.  (Tr. 319.)  He noted that Plaintiff's pain and diarrhea were "controlled," that she was "doing better" and eating "fairly well."  (*Id.*)

Later in March 2010, Plaintiff had a follow up at the Pain Clinic with Dr. Mod Kerkar.  (Tr. 371.)  Plaintiff reported that, despite her prescribed medications, she was still having miserable pain on a daily basis.  (*Id.*)  Dr. Kerkar added a "long acting oxycontin" to Plaintiff's other medications.  (Tr. 373.)

Plaintiff returned to the Pain Clinic the next month.  (Tr. 368.)  Her pain score was six-out-of-ten at rest and eight-out-of-ten during activity.  (*Id.*)  Dr. Vakhariya noted, however, that "[w]ith the current [medication] regiment[,] she has been more active and has not gone to [the emergency room] for pain."  (*Id.*)  He also noted that Plaintiff was not experiencing side effects from her medications.  (*Id.*)

In late May 2010, Plaintiff had another followup at the Pain Clinic.  (Tr. 365.)  She reported pain scores similar to those in April.  (*Id.*)  Dr. Kerkar noted, however, that "[p]ain medications are giving adequate analgesia [pain relief]" and that Plaintiff was not experiencing any adverse side effects.  (*Id.*)  He maintained Plaintiff's medications.  (*Compare* Tr. 365 *with* Tr. 368.)

From June 18, 2010 to June 21, 2010 Plaintiff was hospitalized for "some abdominal pain, but more so back pain."  (Tr. 403.)  Imaging studies revealed a moderate broad-based disc protrusion

at L5-S1 without significant narrowing of the neural foramina and an annular tear at L4-L5 with minimal neural foramina narrowing. (Tr. 391.)[1] A consulting orthopedist assessed degenerative disc disease at L4-L5 and L5-S1. (Tr. 402.) Because Plaintiff had no radiculopathy, however, the orthopedist recommended "conservative" care consisting of medications and physical therapy. (*Id.*)

On June 24, 2010, Plaintiff returned to Dr. Vakhariya at the Pain Clinic. (Tr. 361.) She reported six-out-of-ten pain at rest and eight-out-of-ten pain with activity. (*Id.*) Plaintiff's "dermatomal distribution of pain" was L2-L5 (leg pain). (Tr. 361.) On exam, he found that Plaintiff had pins and needles and numbness beginning above her knees and down through her toes. (Tr. 362.) Dr. Vakhariya remarked that Plaintiff "would most likely benefit from injection procedures," but, because of her Von Willebrand disease, she was "not a candidate." (*Id.*) He continued Plaintiff on the same medications. (*Id.*)

The next month, Plaintiff returned to the Pain Clinic. Plaintiff reported lower back pain, bilateral hip pain, and difficulty walking greater than 10 feet without increased pain. (Tr. 357.) On exam, Dr. Kerkar again found numbness in Plaintiff's lower legs, but also found that she had muscle spasms at L2-L5. (Tr. 358.) Further, Plaintiff had a "positive" straight-leg raising test in the sitting position, and, in the supine position, the test was "painful." (*Id.*) Plaintiff requested a handicap permit and temporary assistance with her activities of daily living. (Tr. 357.) Dr. Kerkar prescribed

---

[1]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae. The *central canal* of the spinal column conveys the spinal cord. At each disc level, e.g., C6-C7, a pair of spinal nerves exit the canal via *neural foramen* and thereby pass into the arms or legs. Joseph T. Alexander, M.D., Assistant Professor of Neurosurgery for Mayo Medical School, *Lumbar Spinal Stenosis: Diagnosis and Treatment Options* (June 1999); The Cleveland Clinic, *Lumbar Canal Stenosis*, http://my.clevelandclinic.org/disorders/stenosis_spinal/ hic_lumbar_canal_stenosis.aspx (visited May 22, 2012); Randy Shelerud, Mayo Clinic Physical Medicine Specialist, *Herniated Disk*, http://www.mayoclinic.com/health/ bulging-disk/AN00272 (visited May 23, 2012).

a six-month handicap permit but did not recommend assistance with activities of daily living. (*Id.*) He continued Plaintiff's existing medication regimen. (Tr. 357.)

In August 2010, Plaintiff told Dr. Vakhariya at the Pain Clinic that she had abdominal and back pain. (Tr. 353.) Dr. Vakhariya stated, "Most of her pain is in the L3-S1 distribution and the T10-L2 distribution for lumbar facet pain and abdominal pain." (*Id.*) As in June, Plaintiff's pain score was six-out-of-ten at rest and eight-out-of-ten with activity. (*Id.*) Dr. Vakhariya's physical examination findings were also the same as at the June exam: numbness in the lower legs, "positive" and "painful" straight-leg testing, and muscle spasms at L2-L5. (Tr. 354.)

Plaintiff had another exam with Dr. Vakhariya in September 2010. (Tr. 351.) She reported a slip in her kitchen causing her to fall on her back. (*Id.*) Dr. Vakhariya noted that Plaintiff had "a history of chronic abdominal pain and back pain, mostly in the T10-L2 and L3-S1 dermatomal distributions." (*Id.*)

On October 4, 2010, Plaintiff spent six days in the hospital for abdominal pain and vomiting after eating two soft tacos. (Tr. 420.) Plaintiff was given fluids and pain medication intravenously. (Tr. 419.)

On October 14, 2010, Dr. Vakhariya noted that Plaintiff's pain was "currently controlled with oral pain medications." (Tr. 348.) Plaintiff still reported six-out-of-ten pain at rest and eight-out-of-ten pain with activity, however, and the physical exam findings were the same as in prior visits: muscle spasms at L2-L5, positive and painful straight leg testing, and numbness in the lower legs. (Tr. 348-49.)

It appears that the Plaintiff's last visit to the Pain Clinic reflected in the administrative record was on December 19, 2010. Dr. Vakhariya stated:

7

> [Patient] has a history of intractable low back pain as well as chronic
> abdominal pain. Controlled with oral pain medications. . . . She
> denies any side effects and has been compliant with her
> medications. . . . She states the medications do help her with her
> functional activity.

(Tr. 342.) Plaintiff again reported six-out-of-ten pain at rest and eight-out-of-ten pain with activity

and the examination findings were the same as in prior exams. (*Id.*)

### 2. Plaintiff's Testimony at the Hearing Before the ALJ

Regarding her abdominal pain and digestive issues, Plaintiff explained,

> I have cramping pain a lot, [for] which I take . . . Dicylcomine . . . .
> Basically, I always have a nagging pain in my stomach . . . . But
> now, when I eat, I will get a really bad cramping depending on how
> I'm doing. And most of the time if I go out to eat or I try to eat . . .
> a normal meal, I have to be close to the bathroom because that
> cramping will start up and then basically everything just goes right
> through me.

(Tr. 56.) Plaintiff testified that food would go through her by way of vomiting or diarrhea, which

occurred at least once a day and for "[a]bout two hours from start to finish." (*Id.*; Tr. 57.) She

noted, however, that when she was last in the hospital a dietician provided a list of recommended

foods. Plaintiff said she tried to eat the recommended diet "as much as possible," but "every once

in a while I want to eat normally." (Tr. 57.) She also stated that Dicylcomine "helps a lot" but that

she only takes it when her cramping is "out of control" because it causes drowsiness. (Tr. 57.)

Plaintiff also testified about her lower-back pain. She arrived at the hearing in a wheelchair

because her left side was "kind of numb and tingly." (Tr. 37, 42.) Plaintiff explained,

> [W]hat my doctor has [recommended] is [that] if my legs are
> working, I don't need [any assistive device]. But [given the location
> of the pain or numbness] in my back, sometimes it will trigger my hip
> to go out. So I use the cane on my right side because it's usually my
> left hip. But [when] it's more involved than that or the pain is
> intense, he wants me to use the wheelchair because [when I'm feeling

8

like that] my fall risk is a lot more.

(Tr. 43.)  Plaintiff testified that she stumbles often but her husband catches her; she also said that she relies on her cane.  (Tr. 44.)  While at the hearing, Plaintiff said she was experiencing back pain at the eight- or nine-out-of-ten level.  (Tr. 59.)

Plaintiff testified that she was quite limited in terms of daily activities.  She said that she could sit for about an hour.  (Tr. 52.)  When asked how long she could stand, she responded, "I can stand.  But when I go to move [that's] my problem."  (Tr. 53.)  Plaintiff said she could lift only about five pounds; she could not explain the medical cause, however: "I don't know why, if it's just because of my joints or what."  (Tr. 53.)  She stated that pain prevents her from sleeping well at night, and, while she wakes at 9:00 a.m., it takes her until 11:00 a.m. "to get going."  (Tr. 47, 51.)  Plaintiff said that she then showers and finally "start[s] her day around 1:00 in the afternoon."  (Tr. 48.)  She testified that at least one day a week she does not get out of bed.  (Tr. 38.)  Her husband cooks, and her children carry the laundry to and from the laundry room.  (Tr. 49-50.)  She stated that "my doctor kind of yelled at me this week because I [tried] to vacuum."  (Tr. 50.)

### 3. Vocational Expert's Testimony at the Hearing Before the ALJ

For the purpose of determining whether jobs would be available for someone with Plaintiff's functional limitations, a vocational expert ("VE") offered testimony about job availability for hypothetical individuals with varying functional limitations.  The ALJ first asked the VE to consider a person of Plaintiff's age, education, and work experience who retained the ability to perform "the full range of sedentary exertional work," but was limited to "lifting or carrying less than 10 pounds generally," "primarily seated work," and "[at most occasional] climbing stairs or crouching, crawling, kneeling, stooping, or bending."  (Tr. 64.)  The VE testified that there would be unskilled

9

jobs that the hypothetical person could perform: about 5,000 "industrial processing" jobs in Michigan and about 1,800 security jobs (e.g., lobby attendant or security monitor) in Michigan. (Tr. 64.)

The ALJ then added a sit-stand limitation and a prohibition on continuous exposure to pulmonary irritants. (Tr. 65-66.) The VE stated that this would reduce the available industrial processing jobs to about 3,200 and reduce the available security jobs to 1,050. (Tr. 65-66.) Additional limitations on workplace hazards and prohibiting the pushing or pulling motion used in vacuuming did not further erode the occupational base. (Tr. 66-67.)

An additional limitation of intermittent use of a cane or wheelchair reduced the security jobs by a third (down to about 700 jobs) but did not affect the number of available industrial positions (still 3,200). (Tr. 67.)

The ALJ then added a limitation of simple, routine, and repetitive work to account for pain- or medication-induced concentration problems. (Tr. 68.) The VE testified that this would not reduce the number of industrial positions (still 3,200) but "[m]ay be a problem in security work." (*Id.*)

Finally, the ALJ asked the VE about a hypothetical individual who would have to take three ten-minute breaks in the morning and three ten-minute breaks in the afternoon; the VE stated that the individual would not be able to sustain employment. (Tr. 68.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act

defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

11

### D.  The Administrative Law Judge's Findings

At step one, ALJ McKay found that Plaintiff has not engaged in substantial gainful activity since the December 10, 2009 alleged onset date.  (Tr. 11.)  At step two, she found that Plaintiff had the following severe impairments: "bowel obstruction, status post laparotomy with lysis of adhesions and small bowel resection; Von Willebrand disease; and degenerative disc disease of the lumbar spine with facet joint disease."  (*Id.*)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 12.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work except that she was further limited to occasional climbing of stairs and ladders, crouching, crawling, kneeling, stooping, and balancing.  (Tr. 12.)  At step four, the ALJ found that Plaintiff could not perform any of her past relevant work.  (Tr. 14.)  At step five, the ALJ relied on VE testimony in response to her hypothetical, and found that work existed in significant numbers that Plaintiff could perform.  (Tr. 15.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal

quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

13

### F. Analysis

Plaintiff is proceeding pro se and thus has not formally raised any legal errors.  In her summary judgment motion filed on June 7, 2012, however, Plaintiff described several post-administrative hearing hospitalizations:

> The court already has my medical records up to the date of the hearing; I would like to point out that I was hospitalized four times since the hearing: from April 27, 2011 to May 1, 2011; from July 5, 2011 to July 9, 2011 (after being treated in the emergency room and erroneously sent home the same day by the attending physician at Crittenton Hospital in Rochester, MI on July 4); from October 17, 2011 to October 22, 2011; and from January 13, 2012 to January 19, 2012.

(ECF No. 10, Pl.'s Mot. Summ. J. at 1.)  She further stated,

> My doctors — specifically, my pain specialist, Dr. Rakesh Vakhariya and my general practitioner, Dr. Suzanne Romadan — have told me that I can expect to be hospitalized roughly every three or four months for the rest of my life; this will occur whenever my body stops digesting food and/or my pain can no longer be controlled by my prescribed medicines.

(*Id.*)

Upon reviewing the parties' motions, on August 10, 2012, this Court suggested that it would treat Plaintiff's pro se reference to her hospitalizations as a request to remand pursuant to sentence six of 42 U.S.C. § 405(g) — if Plaintiff could submit the medical records supporting the additional hospitalizations:

> The Court recognizes that the medical records corresponding to [the] four hospitalizations [referenced in Plaintiff's summary judgment motion] were not submitted to the ALJ.  However, the records may support a sentence-six remand for further administrative proceedings. *See* 42 U.S.C. § 405(g).  Accordingly, the Court requests that, on or before August 24, [2012], Plaintiff submit the medical records pertaining to the four hospitalizations referenced in her motion for summary judgment.

14

(ECF No. 14, Order to Supplement Summ. J. Br. at 1-2.)

Plaintiff timely complied with the Court's request. (ECF No. 15, Pl.'s Br. Summ. of Medical R. Evid.)  Plaintiff has produced medical records corresponding to the four post-administrative hearing hospitalizations referenced in her summary judgment motion and has further produced records from a fifth hospitalization in May 2012.  (*See generally* Pl.'s Br. Summ. of Medical R. Evid.)  Plaintiff further notes that records from "[a] recent [sixth post-hearing] hospitalization [from] August 13-16, 2012 . . . are not yet available."  (Pl.'s Br. Summ. of Medical R. Evid. at 1.) Accordingly, the Court now makes explicit what it had previously suggested: it will treat Plaintiff's explanation about post-hearing hospitalizations as a request to remand pursuant to sentence six of 42 U.S.C. § 405(g).[2]

That sentence provides: "The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  Thus, as the statutory text indicates, a sentence-six remand is only appropriate where a plaintiff can demonstrate that evidence not before the ALJ is "new" and "material," and that there was "good cause" for not producing the evidence earlier. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)).

Evidence is "new" only if it was "'not in existence or available to the claimant at the time

---

[2]The Court is not raising this claim *sua sponte*.  It is fairly implied in Plaintiff's pro se summary judgment filing.  Indeed, the Commissioner addressed a sentence-six remand argument in his summary judgment brief; he simply declined to address Plaintiff's post-hearing hospitalizations.  (*See* ECF No. 13, Def.'s Mot. Summ. J. at 9-11.).

of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Further, "new" evidence must not be merely cumulative of evidence already part of the record. *Wilson v. Comm'r of Soc. Sec.*, No. 10-13828, 2011 WL 2607098, at *6 (E.D. Mich. July 1, 2011); *see also Carroll v. Califano*, 619 F.2d 1157, 1161 (6th Cir. 1980) ("[W]here the issue in question has already been fully considered, further evidence on that point is merely cumulative").

"New" evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). A corollary to this requirement is that "material" evidence must be "probative of the claimant's condition for the time period for which benefits were denied." *Wilson*, 2011 WL 2607098, at *6; *see also Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is . . . immaterial.").

Finally, a claimant shows "good cause" by providing a reasonable justification for failing to acquire and present the new and material evidence to the ALJ. *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984) (per curiam). Good cause "contemplates more than strategic delay, or sandbagging, of evidence and more than simple miscalculation of the necessity of producing such evidence in the first instance to establish a claim of disability." *Haney v. Astrue*, No. 5:07CV 188, 2009 WL 700057, at *6 (W.D. Ky. Mar. 13, 2009) (internal citations omitted).

Plaintiff has provided the Court with medical records corresponding to five hospitalizations in the approximately-one-year period following the April 2011 administrative hearing. In April

2011, Plaintiff was hospitalized for about five days after having a "large meal on Sunday evening during the holiday." (Pl.'s Br. Summ. of Medical R. Evid. at ECF Pg ID 509.) Plaintiff was placed on a pain management regimen and "bowel rest," and was started on clear fluids. (*Id.* at ECF Pg ID 512.) In July 2011, Plaintiff was hospitalized for four days for abdominal pain at the eight-out-of-ten level, frequent diarrhea, and some vomiting. (*Id.* at ECF Pg ID 514.) In October 2011, Plaintiff was hospitalized for five days with "intractable abdominal pain" with pain "poorly controlled . . . with oral pain medication." (*Id.* at ECF Pg ID 518.) In January 2012, Plaintiff was hospitalized for six days for "severe abdominal pain, nausea, and vomiting." (*Id.* at ECF Pg ID 522.) In May 2012, Plaintiff was hospitalized for two days with abdominal pain "not associated with a sick contact or recent travel or eating out." (*Id.* at ECF Pg ID 530.) As noted, Plaintiff reports (but was unable to timely produce records from) a three-day hospitalization in August 2012. (*Id.* at ECF Pg ID 508.)

The Court believes that this case should be remanded pursuant to sentence six for the ALJ to consider these records. As an initial matter, it is plain that Plaintiff's evidence satisfies two of the three sentence-six remand requirements. First, the hospital records from April 2011, July 2011, October 2011, January 2012, and May 2012 are "new" because none of these records were in existence at the time of the administrative hearing, which is when the ALJ closed the administrative record. And, even if the Court were to use the date that the ALJ issued her decision, May 10, 2011, the records for the last four hospitalizations were not yet in existence. *Glenn v. Astrue*, No. 3:09CV0296, 2010 WL 4053548, at *18 (Aug. 13, 2010) *report and recommendation adopted by* 2010 WL 4053546 (S.D. Ohio Oct. 14, 2010) ("such evidence certainly qualifies as 'new,' having been rendered after the ALJ's . . . decision in this case."); *Obeshaw v. Comm'r of Soc. Sec.*, No. 1:08-CV-559, 2010 WL 955613, at *1 (W.D. Mich. Mar. 15, 2010) ("This evaluation does

17

constitute 'new' evidence because it was performed after the ALJ entered his decision . . . and the ALJ did not consider it in denying Plaintiff's claim for disability insurance benefits.").

Plaintiff also meets the "good cause" requirement because there is no way she could have obtained these hospital records at the time the ALJ closed the administrative record, or, for at least the last four sets of records, at the time the ALJ rendered her decision.   This is not a case of sandbagging, strategic delay, or even generating additional opinion evidence after the ALJ's decision. *Cf. Perkins v. Apfel*, 14 F. App'x 593, 598 (6th Cir. 2001) ("The mere fact that the evidence at issue was not created until nine months after the ALJ's decision and was not submitted to the Appeals Council until nearly a year after the ALJ's decision does not establish good cause. This Court takes a harder line: [the claimant] must establish good cause for his failure to obtain the evidence prior to the hearing."); *Koulizos v. Sec'y of Health and Human Servs.*, 1986 WL 17488 at *2 (6th Cir. Aug. 19, 1986) ("'Good cause' is shown for a sentence-six remand only 'if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability.'").   Rather, given the nature of the records (unplanned hospitalizations) and the timing of their creation (all, save one, after the ALJ's decision) Plaintiff has "good cause" for not producing the records to the ALJ.

The "materiality" requirement presents a closer call.  In this regard, Plaintiff's evidence must clear two hurdles: (1) the evidence must be probative of the time period in question and not simply evidence of a deteriorating condition, and (2) the evidence must have a reasonable probability of leading the ALJ to a different outcome.  As for the first requirement, the April 2011 and July 2011 hospitalizations are prior to Plaintiff's date last insured, September 30, 2011; they therefore, are probative of the disability period at issue. *See Simmons v. Comm'r of Soc. Sec.*, No. 1:10CV1600,

2011 WL 4344040, at *2 (N.D. Ohio Sept. 14, 2011) ("[T]o be granted DIB, Plaintiff has the burden of proving that he was disabled prior to his [date last insured]").  Further, Plaintiff's October 2011 and January 2012 hospitalizations, both within three-and-a-half months of the date last insured, and both for a medical condition existing well prior to the date last insured, are at least marginally probative of Plaintiff's condition prior to September 30, 2011.  *See Keil v. Comm'r of Soc. Sec.*, No. 10-CV-13973, 2011 WL 4407149, at *11 (Aug. 30, 2011) *report and recommendation adopted by* 2011 WL 4406337 (E.D. Mich. Sept. 22, 2011) ("Admittedly, 'evidence relating to a time outside the insured period is only minimally probative' to the disability determination, but the Sixth Circuit has stated that it nonetheless 'may be considered to the extent it illuminates a claimant's health before the expiration of his insured status.'" (quoting *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (table), 1999 WL 777355 (6th Cir. 1999))); *McCracken v. Comm'r of Soc. Sec.*, No. 1:08-CV-327, 2009 WL 2983049, at *3 (S.D. Ohio Sept. 14, 2009) ("[M]edical evidence obtained after Plaintiff's insurance status expired is not relevant, except perhaps to the extent that it relates back to the covered period." (internal citation omitted)).

Remaining is whether there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.  The Court acknowledges, as argued in the Commissioner's summary judgment motion, that at least some of the ALJ's reasons for discounting Plaintiff's credibility are sound.  (Def.'s Mot. Summ. J. at 6-9.)  For instance, the ALJ's implicit finding that Plaintiff could, contrary to her testimony, lift more than five pounds appears entirely reasonable given this Court's review of the medical record.  As another example, it appears that the ALJ correctly concluded that no physician prescribed Plaintiff a wheelchair (although the medical records do support lower-leg

19

numbness and difficulty ambulating).   Although Plaintiff may have overstated some of her functional limitations at the hearing, a disability finding must be based not only on the limitations that the claimant testifies to but also those limitations that have clear support by the medical evidence.   *See* 20 C.F.R. § 404.1545 ("We will assess your residual functional capacity based on all of the relevant medical and other evidence.").

The ALJ discounted the import of Plaintiff's many hospitalizations between November 2009 and October 2010 — eight — because, in the ALJ's words, "[the claimant's] condition appears to have stabilized based on the medical evidence."   (Tr. 13.)   Plaintiff was not hospitalized in the approximately six months prior to the April 2011 administrative hearing.   (*See* Tr. 41-42.)   So the "stabilized" finding was, at the time the ALJ made her decision, reasonable.   But Plaintiff's sentence-six evidence of multiple hospitalizations since the administrative hearing paints a different picture of her medical condition.   The evidence of continued, unplanned hospitalizations for abdominal pain and digestive issues shows that her condition has not "stabilized."

Plaintiff's sentence-six evidence might also result in a different outcome on remand for another reason: work absences.   Between November 2009 and October 2010 Plaintiff was hospitalized for 44 days.   She has now produced evidence that she was hospitalized for 14 days in 2011, and, so far in 2012, 11 days.   It is far from plain that a person requiring hospitalization as frequently as Plaintiff — 69 days in less than three years (about two days per month) — would be able to maintain substantial gainful employment.   In fact, the VE testified that missing more than two days of work per month would likely preclude full-time employment.   (Tr. 69.)   Thus, while the ALJ could have reasonably concluded that Plaintiff had only experienced significant work absences from November 2009 through October 2010 based on the information then before her, it is less clear

20

whether this is a valid inference given Plaintiff's sentence-six evidence.

In sum, a sentence-six remand is appropriate in this case because Plaintiff's evidence of post-hearing hospitalization is "new" and "material," and Plaintiff had "good cause" for not producing the evidence earlier. *See Foster*, 279 F.3d at 357. The Court therefore does not address whether substantial evidence supports the ALJ's decision. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("When the district court issues . . . a remand order[] under sentence six of 42 U.S.C. § 405(g), it 'does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding.'").

### G.  Conclusion

For the foregoing reasons, this Court finds that Plaintiff has shown good cause for producing new evidence which is material to the disability determination. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence six of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED to consider the newly produced evidence. The Court further RECOMMENDS that jurisdiction be retained. *See Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006) ("[A] district court retains jurisdiction when remanding a social security claimant's case pursuant to sentence six.").

21

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson_____
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  September 11, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 11, 2012.


s/Jane Johnson_____
Deputy Clerk

22